The Humko Company v. Commissioner.
Humko Co. v. Commissioner
Docket Nos. 112235, 79.
United States Tax Court
1943 Tax Ct. Memo LEXIS 34; 2 T.C.M. (CCH) 1121; T.C.M. (RIA) 43511; December 11, 1943
*34 Marion G. Evans, Esq., 600 Commerce Tile Bldg., Memphis, Tenn., J. Fred Brown, Esq., and Allan Davis, Esq., for the petitioner. Charles P. Bagley, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income tax for fiscal years ending on August 31, 1938; August 31, 1939; and August 31, 1940, in the respective amounts of $1,328.21, $2,007.49, and $113. Petitioner claims an overpayment of $1,900 in tax for the fiscal year ended August 31, 1940. The only question in issue is whether respondent erred in disallowing deductions of amounts claimed to represent payments of interest in each of the taxable years. Petitioner's returns were filed with the collector for the district of Tennessee. Findings of Fact Petitioner is a Tennessee corporation having its principal office in Memphis, Tennessee. Its business is the refining of vegetable oils and the manufacture of shortening. Petitioner keeps its books and makes its returns on the accrual basis. It reported income on the calendar year basis prior to 1938. In 1938, it received permission to report its income on the accrual basis with its fiscal year ending on August *35 31 of each year. S. L. Kopald and Herbert Humphreys are the president and vice president of petitioner. They are also directors. They are the sole stockholders. Prior to July 1, 1935, Kopald and Humphreys were co-partners in a partnership which carried on a business of refining vegetable oils. They had a total capital investment in the partnership in the amount of $273,554.69. Petitioner was organized on July 1, 1935, to take over the business which had been conducted by the partnership. All of the assets of the partnership were conveyed to petitioner on or about July 1, 1935; petitioner assumed the liabilities of the partnership. The partnership assets included fixed assets, land, plant and machinery, hydrogenating plant, new frame buildings, autos and trucks, office furniture and fixtures, having a book value of $107,099.20. The quick assets, consisting of cash, accounts receivable, and inventories, had a book value of $325,294.86, and other assets had a book value of $3,732.70. The total book value of all of the assets was $436,126.76. The book value of the assets was less than the appraised value shown by an appraisal which the partners had made around the date of July 1, 1935. *36 The total liabilities, consisting chiefly of notes and accounts payable, were $162,572.07. The net book value of the assets was $273,554.69. Kopald and Humphreys transferred to petitioner their interest in $226,000 of partnership assets in exchange for $226,000 par value of petitioner's stock consisting of $176,000, 5 percent cumulative preferred stock, and $50,000 common stock, which was issued in equal amounts to Kopald and Humphreys. The excess of the value of the partnership assets above $226,000 was a loan to petitioner by Kopald and Humphreys in the total amount of $47,554.69, and petitioner's balance sheet as of July 1, 1935, carried as liabilities notes payable to the two stockholders in the total amount of $47,554.69. Petitioner's outstanding stock consisted of 500 shares of common stock and 1,760 shares of preferred stock, both classes having a par value of $100 per share. At some time prior to January 19, 1937, Kopald and Humphreys proposed that petitioner retire all of the preferred stock at par. On January 19, 1937, petitioner's directors adopted a resolution to call and pay for all of the preferred stock on February 1, 1937. The preferred stock was called; Kopald and *37 Humphreys surrendered their certificates; the stock certificates were canceled. All of this was done on or about February 1. According to the balance sheet of petitioner as of December 31, 1936, petitioner's earned surplus was only $86,474.90. Its quick assets amounted to about $500,000. On or about February 1, 1937, the balance in petitioner's checking account with the Union Planters National Bank and Trust Company was $47,647.77. The balance in another checking account in the First National Bank in Memphis was about $50,000. After the transaction hereinafter described these bank balances were not increased but remained the same. At the time the stockholders surrendered their preferred stock, petitioner issued two checks in the amount of $88,000, each, total $176,000, to each stockholder. The checks were issued against petitioner's checking account with the Union Planters Bank. The checks were dated February 1, 1937, but they were deposited, paid, and cleared through the bank on February 6. Simultaneously, Kopald and Humphreys issued their personal checks, payable to petitioner, in the amounts of $88,000 each. These two checks also were deposited, paid, and cleared through the *38 Union Planters Bank on February 6. The exchange of the checks was a wash transaction. Neither petitioner nor Kopald and Humphreys were any richer or poorer after the four checks had been deposited and paid in the Union Planters Bank. There were two accounts on petitioner's books in the name of each stockholder called loan accounts. Entries were made in these accounts as of February 1, 1937, to reflect loans from Kopald and Humphreys to petitioner in the amount of $88,000, each. The entries referred to Folio C 23 (cash), and stated that interest began on February 1, 1937. Petitioner did not issue notes to its stockholders. Petitioner was advised not to issue notes to save the stockholders from tax on interest under the Tennessee tax law which taxes interest on notes but which does not tax interest on demand notes. The understanding between petitioner and its stockholders with regard to the above transaction was that the stockholders had made demand loans to petitioner at 6 percent interest. Prior to the transaction, petitioner's officers advised the Union Planters Bank and the First National Bank that it was proposed to borrow $176,000 from stockholders and to retire the preferred *39 stock. At the time petitioner owed $100,000 and $50,000 to the above banks, respectively. Petitioner had a line of credit with the Union Planters Bank of about $390,000. The banks charged interest at the rate of 3 percent on loans. The bank officials advised petitioner that the indebtedness to stockholders would have to be subordinated to its indebtedness to the banks. Petitioner agreed. After the above transaction, there was no change in petitioner's surplus. On petitioner's balance sheet appeared "Liabilities to Stockholders" in amounts which included the $176,000 carried in the loan accounts in the names of the stockholders. On February 1, 1937, the balances in the loan accounts on petitioner's books in the names of the stockholders were $11,000, in each account, or, $22,000. The entries, dated December 30, 1936, on the ledger sheets of these loan accounts refer to Folio C 262 (cash), and the entries read, "Check from H.H.", and "Check from S.L.K." On May 28, 1938, entries were made in each account of $1,000, each. The entries read, "Trans. from Personal J. 157." It was intended that these advances to petitioner were demand loans from each stockholder. Petitioner paid interest *40 to the stockholders monthly at the rate of 6 percent. The total amount of these advances was $24,000. On August 31, 1940, petitioner paid to each stockholder "on account", $25,000, or a total of $50,000. These payments reduced the balance in each loan account on that date from $100,000 to $75,000. Petitioner paid interest monthly at the rate of 6 percent on the entire amount of the balance in each loan account, which included the total amount of $176,000. Petitioner's balance sheet for the year ended December 31, 1936, which was just prior to the retirement of petitioner's preferred stock, is set forth in schedule A. SCHEDULE A Balance Sheet as of December 31, 1936 Assets
QUICK:
Cash in Banks
$ 38,252.41
Accounts Receivable - Sales
135,450.86
Merchandise Inventories
262,866.57
Hedge Account (Zimmerman-Alderson-Carr Co.)
65,000.00
$501,569.84
FIXED:
Land
5,000.00
Plant and Machinery
150,995.24
Autos and Trucks
3,119.50
Office Furniture and Fixtures
1,433.29
160,548.03
Less: Depreciation Reserve
41,166.55
119,381.48
OTHER ASSETS:
3,560.45
Total Assets
$624,511.77
Liabilities
CURRENT:
Notes Payable - Banks
$200,000.00
Notes Payable - Others
25,253.47
Accounts Payable
12,692.04
Accounts Payable - Herbert Humphreys
11,500.00
Accounts Payable - S. L. Kopald
11,500.00
Accrued expenses, taxes, etc.
19,500.17
280,445.68
CONTINGENT:
Reserve for Purchase of Refining Machinery
4,591.19
OTHER LIABILITIES:
Loan from Herbert Humphreys
11,000.00
Loan from S. L. Kopald
11,000.00
22,000.00
RESERVE FOR BAD DEBTS
5,000.00
NET WORTH:
Capital Stock - Common
50,000.00
Capital Stock - Preferred
176,000.00
Surplus
86,474.90
312,474.90
Total Liabilities and Capital
$624,511.77
*41 For the years 1935 through 1940, petitioner's net income and earned surplus were as follows at the end of each year or fiscal year: Earned
Net
Surplus
Income
December 31, 1935
$ 69,123.52
December 31, 1936
$ 86,474.90
71,151.38
December 31, 1937
182,442.72
126,725.58
August 31, 1938
251,484.66
69,041.94
August 31, 1939
330,859.01
109,374.35
August 31, 1940
415,689.28
114,830.27
During the period 1935 through August 31, 1940, petitioner paid a total amount of $144,557.76 in dividends, as follows: Dividends were paid on common stock during the calendar years 1936, 1937, 1938, and 1940, in the amounts of $45,000, $30,000, $30,000 and $30,000, respectively, total $135,000. Dividends were paid on preferred stock during 1936 and 1937 in the amounts of $8,800 and $757.76, respectively, total $9,557.76. During the above period petitioner's total net income was $560,247.04. Subtracting total dividends of $144,557.76 from total net income leaves $415,689.28, earned surplus as of August 31, 1940. Petitioner was indebted to Kopald and Humphreys in the amount of $12,000 each, for the two advances which each made to petitioner in 1936 and 1938 in the amounts of *42 $11,000 and $1,000. These advances were loans. The amounts which petitioner paid its stockholders as interest on the above amounts in the taxable years constituted payments of interest. The transactions which occurred on February 6, 1937, did not create an indebtedness of petitioner to its stockholders in the amount of $176,000. The payments which petitioner made to its stockholders during each of the taxable years as 6 percent interest on $176,000, did not constitute payments of interest but, rather, did constitute payment of dividends. Opinion In its returns for each of the taxable years ended on August 31 of 1938, 1939, and 1940, petitioner deducted various amounts for interest. Respondent disallowed a part of the total deduction taken in each return as follows: $8,049.68, $12,166.72, and $12,200. The amounts of the alleged interest payments which respondent disallowed are not in dispute. The question is whether all or any part of the above amounts represented payments of interest. The question depends upon whether a debtor-creditor relationship existed between petitioner and its stockholders. The broad question has two parts: the first relates to advances by each stockholder *43 of $11,000 in December of 1936, and $1,000 in May of 1938; the second part relates to the transaction involving exchanges of checks between petitioner and its stockholders and the surrender and cancellation of all of the 5 percent preferred stock. 1. Respondent contends that petitioner was not indebted to its stockholders for advances totaling $12,000, each. Respondent contends that such advances were contributions to capital. We are satisfied from the record that each stockholder loaned petitioner $11,000 and $1,000 in 1936 and 1938. We do not believe the record shows that the item of $11,000 in each loan account was a balance of loans in the amounts of $19,240.98 and $19,240.97 which allegedly were made at the time of the transfer of properties from the former partnership to petitioner. The testimony of the accountant and auditor for petitioner does not state such to be true. His testimony was vague, but he stated that he believed that the balance of $11,000 in each loan account at the end of 1936 was created by the advance of cash. The entries on the ledger sheets state that such amount were paid to petitioner by checks from its two stockholders. While the evidence relating to *44 the $11,000 and $1,000 items is extremely limited, it cannot be said that petitioner has failed to meet its burden of proof with respect to the two items. The testimony of S. L. Kopald and G. A. Watson, and the accounting evidence, supports the conclusion that each stockholder advanced these amounts to petitioner as loans, and that a debtor-creditor relationship was created. It is held that petitioner was indebted to each stockholder in the amount of $11,000 in each of the taxable years, and in the additional amount of $1,000 after May 28, 1938. It is held, further, that amounts paid by petitioner in each taxable year as interest at the rate of 6 percent on the above amounts were payments of interest for which deductions are allowable. 2. The main question relates to and grows out of the transaction involving the retirement and cancellation of all of the preferred stock as of February 1, 1936. If the transaction resulted in the creation of an indebtedness of petitioner to its stockholders in the amount of $176,000, the payments which petitioner made to the stockholders in each of the taxable years at the rate of 6 percent per year on $176,000 were interest, but if no indebtedness *45 was created the payments were dividends. Respondent contends that the transaction was a wash transaction in which petitioner's checks were offset by the checks of the two stockholders, that the entire transaction amounted to nothing more than a series of bookkeeping entries, and that no indebtedness to the stockholders was created. Respondent contends that the transaction was nothing more than a tax saving scheme and that no effect should be given to it for tax purposes, citing ; ; ; , and other cases. The evidence shows that the purported retirement of the preferred stock was a sham and a device in a tax scheme, that it had no business purpose to petitioner, and that no debtor-creditor relationship was created by the alleged loans of $176,000 to petitioner. In the first place, the so-called demand loans carried 6 percent interest. Petitioner could borrow from banks at 3 percent interest. It served no business purpose *46 to petitioner to purportedly borrow from its two stockholders at a rate of 6 percent. Such arrangement is unreal on its face. Petitioner had a credit line with banks up to $390,000; it owed banks $150,000; and if it had any need for or intent to borrow as much as $176,000 in February, 1937, it could have borrowed from banks at a low rate of interest. Kopald testified that the arrangement was for the purpose of giving each stockholder some independent means outside of his proprietary interests in petitioner as evidenced by stock ownership. If that was the purpose, it does not aid petitioner. It has been said frequently that arrangements to suit the personal convenience of stockholders cannot be held to relate to the business and business purposes of a corporation, where no business purpose to the corporation is served. The real question is whether or not there was any substance to the entire transaction. The evidence shows abundantly that there was not. Petitioner was not in such financial condition that it could reduce its capital in 1937 by the amount of $176,000. The reality of the transaction may be tested by inquiring whether petitioner could have immediately paid the so-called *47 demand loans, and, thereby, taken the above amount out of its business. That question must be answered in the negative. Petitioner could not have paid out $176,000 on demand loans in 1937 without impairing its existence as well as the rights of creditors. The balance sheet as of December 31, 1936, is the best evidence before us relating to petitioner's financial condition on or about February 6, 1937, the date the alleged demand loans were made. Petitioner owed banks $150,000; its cash and accounts receivable amounted to about $173,700; its inventories amounted to $262,866. Petitioner would have had to liquidate its inventories and use its entire cash resources to have paid the so-called demand loans at any time close to the time the loans are said to have been made. Under such circumstances we cannot believe that the parties had any real intent to make demand loans to petitioner. The arrangement lacked bona fides. It is pointed out that there was no corporate authorization in any resolution, duly adopted, for petitioner to borrow on demand from its stockholders; there were no notes, there was no written agreement. The banks were told that petitioner intended to "borrow" from *48 its stockholders. They required that any such "indebtedness" should be subordinated to bank indebtedness. The situation here resembles that in , except that here there was no evidence of indebtedness to the former owners of the preferred stock, whereas in that case the former owners of preferred stock received securities styled debentures, without maturity dates. The court held that the debentures resembled preferred stock, and were in effect stock, and that payments of so-called interest were not interest, for tax purposes, but were in the nature of dividends. With respect to the alleged partial liquidation in 1937, it should be noted that petitioner neither intended to nor did in fact contract its business so as to be able to operate with reduced capital. Petitioner's business was increasing. Its sales were one-third greater than in the preceding year; its inventories increased from $262,866.56, as of December 31, 1936, to $379,385.21, as of December 31, 1937. During 1937, petitioner made additions to its plant and equipment in the amount of $75,025.21, which was the largest investment it *49 had made to enlarge its plant. In 1939 it had expended $33,728.25 for additions to plant and equipment. Petitioner was, in fact, in a period of expansion. The alleged reduction of capital was not bona fide. Petitioner did not release $176,000 of capital upon the surrender of the preferred stock in 1937. Furthermore, it is clear that petitioner actually needed all of its working capital in 1937. Upon consideration of all of the evidence it is held that the transaction in February 1937 did not create a debtor-creditor relation between petitioner and its stockholders, and the alleged payments of interest in the taxable years on the so-called indebtedness of $176,000 were not interest. It is held, further, that the payments in question constituted dividends. Respondent's determination under this issue is sustained. Petitioner filed an amendment to its petition and claimed that it overstated its income for the fiscal year ended in 1940 by the amount of $10,000. Respondent did not file an answer to the amendment. He stated at the hearing that it was not necessary. In the notice of deficiency it appears that respondent excluded $10,000 from taxable income. There is no issue before *50 us on this point. Perhaps petitioner's reason for covering this item in an amendment to the petition constitutes a way of asserting that it has overpaid tax for the year ending in 1940. Whatever the result may be, in view of our conclusion on the issues presented, will be made clear in a recomputation of petitioner's tax liability under Rule 50. Decision will be entered under Rule 50.